IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MELISSA L. PETTIT, | ) | |
| | ) | 8:09CV206 |
| Plaintiff | ) | |
| | ) | |
| v. | ) | MEMORANDUM AND ORDER |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner | ) | |
| of the Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

This is an action for judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner"). Plaintiff appeals a final determination of the Commissioner denying her application for Social Security benefits. This court has jurisdiction under 42 U.S.C. §§ 405(g) and 1383(c)(3).

On or about August 4, 2004, Melissa L. Pettit ("Pettit") filed an application for Title II disability benefits, alleging an onset date of January 31, 1999. Social Security Transcript ("Tr.") at 14. The claim was denied initially and upon reconsideration, and Pettit timely requested a hearing before an Administrative Law Judge ("ALJ"). *Id*. That request was granted, and a hearing was held on April 7, 2006. *Id*. Pettit, her attorney, her husband, and vocational expert Warren Haagenson (via telephone) appeared before the ALJ. Tr. 14, 725-778. At the hearing, Pettit amended her onset date to February 5, 2001. Tr. 14, 777. After the hearing, the ALJ made the following determinations: (1) Pettit acquired sufficient quarters of coverage to meet disability insured status only for the period of February 5, 2001, through March 31, 2005; (2) she did not engage in substantial gainful activity during that time period; (3) she had bipolar affective disorder, anxiety-related and obsessive compulsive features, a benzodiazepine dependence disorder, and degenerative

lumbar disc disease; (4) that those impairments did not meet or equal the listed impairments ("the Listings") in 20 C.F.R. 404.1520(d), 1525, and 1526; and (5) that Pettit retained sufficient residual functional capacity ("RFC")[1] to perform work within certain limitations.  Tr. 16-18.  On June 13, 2006, the ALJ determined that Pettit was not disabled during the period of February 5, 2001, through March 31, 2005, and denied benefits.  Tr. 15, 29.  Pettit then timely filed this appeal in the United States District Court for the District of Nebraska.  Filing No. 1.

## BACKGROUND

Pettit entered the United States Air Force after graduating from high school.  Tr. 68-73, 731-32.  Pettit first reported she had problems with her back and depression issues while in the Air Force.  Tr. 219, 225, 445, 492, 731.  She filed for and received a disability determination and benefits from the Veteran's Administration ("VA") after an honorable discharge from the Air Force.  Tr. 733.  That determination categorized Pettit as 70% mentally disabled due to bipolar disorder as well as "some" disability for physical impairments.  Tr. 497, 733.  After her military discharge, she worked for the United States Post Office from 1995 to 1999.  Tr. 86-87, 732-733.  Her employment with the Post Office was complicated by alleged employment discrimination and retaliation after she filed a complaint.  Tr. 22.  That employment ended with a settlement agreement between the Post Office and Petitt.  *Id*.  Pettit has not worked since ending her employment with the Post Office.  Tr. 72, 733.

---

[1]Residual Functional Capacity is defined as the claimant's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, i.e., eight hours a day, five days a week, or an equivalent work schedule.  Soc. Sec. Rul. 96-8p.  RFC is what an individual can still do despite his limitations.  20 C.F.R. § 404.1545(a).

2

Medical records show that Pettit has been seen at the VA Medical Center ("the VA") in Omaha since April 21, 1998, for mental health issues and since January 14, 1994, for back pain and other physical issues.  Tr. 591, 652.  Those records show consistent and regular evaluation and treatment, with the mental health treatment focusing on bipolar disorders, generalized anxiety, and obsessive-compulsive symptoms.  Tr. 437-724.  The VA records and records from Bellevue Family Practice, Nebraska Spine Center, and Alegent Health show treatment for back pain, namely, lumbago and degenerative disc disease.  Tr. 286-724.

Medical records show that Petitt's back pain began during active duty in the Air Force.  Tr. 225.  Radiology Diagnostic Report notes from a VA Compensation and Pension Examination on January 14, 1998, state that a complete lumboscral spine imaging showed "[m]oderate to severe degenerative disc disease at the T12-L1 vertebral level. . . .  [t]here is a complete loss of the anterior intervertebral disc space at this level with approximately 50% loss in the posterior one-half of the disc space."  Tr. 652.  Physical Therapy notes from March 13, 2001, state that "Cervical ROM is tight," and lists problems as: "(1) Decreased mobility of C3 vertebra and gross cervical flexion; (2) Increased pain in upper back and neck."  Tr. 552.

A pain assessment form given to Pettit at a March 30, 2001, physical therapy appointment posed the following:  "During the past 24 hours, pain has interfered with your: (1) Physical activity; (2) Emotions; (3) Appetite; (4) Relationships with others; (5) Sleep; (6) Overall enjoyment of life," and gave the following scale: "0%=none; 20%=some; 40%=moderate; 70%=much; and 100%=complete."  Tr. 544-545.  Pettit gave these responses:  "[pain has interfered with]: Physical activity--70%; Emotions–50%; Appetite--

3

0%; Relationships with others–50%; Sleep–70%; Overall enjoyment of life–70%."  *Id*.  At that same physical therapy appointment, physician's assistant Richard P. Beatty assessed Pettit's aggravation of her back after she picked up her son as an "acute flare-up of chronic low back condition."  Tr. 543.

Pettit sought treatment at the VA Primary Care Clinic for back pain on February 14, 2002, and medical notes of John W. Sype, co-signed by Nicoline V. Lee, M.D., state, "[Pettit] has unfortunately had to stop working and has also stopped school because of problems with her back.  She did participate in physical therapy here for quite some time; however, did eventually stop because of a plateau of improvement."  Tr. 495.  Further notes from that visit state, "Straight leg lifts are negative for reproducing signs of sciatica; however, the [sic] do cause significant back discomfort in the lumbar back area. . . .  [S]he does walk with a slightly antalgic gait."  *Id*.

In July of 2004, Pettit spent three days in the hospital after injuring her back while upholstering furniture.  Tr. 289-325.  Following her release, she saw Dr. Eric Phillips at the Nebraska Spine Center, who noted, "[T]he patient demonstrates a far lateral disc herniation at L4-L5 on the right compressing the L4 nerve root. . . .  She demonstrates advanced disc degeneration at L4-L5 with an L5 transitional segment."  Tr. 327.  He also noted that "She can forward flex to touch her fingertips just to the knees. . . .  Straight leg raising is negative."  *Id*.  Dr. Phillips stated that Pettit would be a good candidate for surgery.  Tr. 328.  Pettit sought a second opinion on the surgery from VA physician Charles Taylon on July 29, 2004, who did not recommend surgery.  Tr. 604.  Progress notes dated March 15, 2005, show that Pettit continued to experience back pain up to and after the end of her insured status.  Tr. 445.  Those same progress notes state, "Although she feels

4

better since last 07/2004 [the date of her injury and hospitalization] . . . [s]he is currently walking about 2 blocks to and from school with her children [sic] in the morning." *Id*.

Pettit's mental impairments began in her teenage years, with her first hospitalization at age 19 after a suicide attempt while she was in the Air Force. Tr. 491, 591. Initial diagnoses listed depression and mood swings, with VA treatment notes listing a "history of bipolar" on July 13, 1999. Tr. 577. Pettit began seeing Dr. Beverley Tupper Mead at the VA on February 9, 2000, and continued seeing him regularly until Dr. Mead left the VA in December of 2001. Tr. 573, 497. Treatment notes from Dr. Mead of that first encounter show that Pettit had a diagnosis of depression, to which Dr. Mead added generalized anxiety. Tr. 573. Dr. Mead added diagnoses of Obsessive-Compulsivity and social phobia on April 19, 2000. Tr. 570. Dr. Mead confirmed a previously-diagnosed bipolar disorder on September 20, 2000. Tr. 563. Dr. Mead's treatment notes show effects of these mental impairments on Pettit's daily life caused by obsessive-compulsive personality, bipolar disorder, and generalized anxiety, which are explained in detail below. Tr. 499, 501-502, 525-531, 539-540, 554, 557, 559, 563-566, 569-573.

**Obsessive-Compulsive Personality**: On May 10, 2000, Dr. Mead wrote that Pettit could not sleep the night before her appointment because she was up worrying about an exam she would be taking for a class. Tr. 569. In September of 2000, Dr. Mead's notes reflect a discussion with Pettit regarding her obsession with getting straight-A's, in which Pettit stated she has to drop out of a class if she suspects she will get less than an A in the class. Tr. 563. On June 6, 2001, Dr. Mead opined that Pettit's straight-A average in her classes is a manifestation of her obsessive-compulsive tendencies. Tr. 530. Dr. Mead reported on June 27, 2001, that Pettit's obsessive-compulsive tendencies were not "too

5

severe, certainly not incapacitating," but on October 31, 2001, Dr. Mead noted that he abandoned efforts to reassure Pettit regarding her obsessive-compulsivity and a possible treatment option.  Tr. 501, 528.

**Bipolar Disorder**:  On June 21, 2000, Dr. Mead noted that Pettit reported she was planning to have tubal ligation because she [Pettit] "knows her limitations."  Tr. 565.  On that same visit, Dr. Mead noted that Pettit wanted to continue seeing him "[f]or whatever supportive therapy I can offer and to continue medication."  *Id*.  Medical records show prescriptions for divalproex and alprazolam at this time.  Tr. 565, 569-570.  In January of 2001, Dr. Mead added the antidepressant venlafaxine to Pettit's regimen, with the addition of nefazodone in March of 2001.  Tr. 554, 557.  Dr. Mead's notes of April 4, 2001, show that Pettit was not happy at all, even with the news that an article she wrote would be published in a culinary arts journal, and that Dr. Mead doubled the amount of Pettit's nefazodone.  Tr. 539.  During her course of treatment with Dr. Mead, Pettit was assessed in a VA Compensation and Pension Examination on June 19, 2001.  Tr. 623.  In a report of that exam, Dr. E. Haffke wrote:  "She continues to not sleep well. . . .  The depressive symptoms have persisted and are severe a few days out of each month. . . .  She reports being miserable, sad, and having difficulty getting out of bed.  She spends more time sleeping. . . .  [T]here are continued severe occasional rituals and inability to cope independently without help of her husband and her in-laws and her treatment at the Omaha VA Mental Health Clinic."  Tr. 622-623.  Dr. Haffke further stated,  "The information she presents appears to be valid."  *Id*.  In August of 2001, Dr. Mead listed Pettit's treatment plan as "Continue current supportive care and medication."  Tr. 525.  On October 31, 2001,

Dr. Mead saw Pettit and noted that she was "in obvious distress" and was "miserable" and "depressed." Tr. 501.

**Anxiety**: Dr. Mead first diagnosed Pettit with anxiety on February 9, 2000, when Pettit reported increasing difficulty in going to work due to the stress of encountering co-workers. Tr. 573. On March 22, 2000, Dr. Mead's notes state that the thought of returning to work [after maternity leave] was more than Pettit could stand and, therefore, Pettit would not return to work. Tr. 572. In a September 29, 2000, letter, Dr. Mead stated that Pettit had a low tolerance for stress, and that stressors during her employment with both the Air Force and the Post Office led to increasing anxiety, depression, and frustration, which Dr. Mead considered "significant" in Pettit's work adjustment problems. Tr. 168-169.

Dr. Mead left the VA in December of 2001, and the record shows Dr. Praveen Fernandes acted as Pettit's treating mental health physician from March of 2002 through May 19, 2005. Tr. 491-494. Dr. Fernandes's notes of the first visit reveal that Pettit had tried various medications in the past, including Prozac, Paxil, Zoloft, Wellbutrin, Xanax, and trazodone, and that Pettit currently reported being depressed and frustrated. *Id*. Dr. Fernandes noted that she was "well-kept" and "logical" but revealed some ideas of "hopelessness, helplessness, and worthlessness," and he added citalopram to Pettit's regimen. *Id*. On May 2, 2002, Dr. Fernandes reported that Pettit sleeps about twenty hours a day and is still tired. Tr. 490. The record shows that on June 25, 2002, Pettit called requesting an inpatient admission because she "could not function." Tr. 486. Dr. Fernandes advised Pettit to go to the emergency room for an evaluation. *Id*. On October 3, 2002, Dr. Fernandes reported that Pettit's bipolar disorder appeared to be in remission but that she had symptoms of anxiety and irritability. Tr. 472. By December 19, 2002, Dr.

7

Fernandes reported Pettit's bipolar disorder as "mixed," and noted that she was experiencing worsening depression, racing thoughts, and disturbed sleep.  Tr. 469.

Approximately thirty various treatment notes from December 19, 2002, through May 19, 2005, document cycles of depression and remission, as well as adjustments in medications and their dosages.  Tr. 443, 448-449, 452, 455, 458, 461-462, 466-469. Throughout that period, Dr. Fernandes suggested activity scheduling to relieve the effects of Pettit's bipolar disorder on her daily life.  Tr. 449, 452.  Specifically, on February 10, 2005, Dr. Fernandes noted that Pettit had returned to ceramics classes, and that when Pettit expressed difficulty with household tasks, Fernandes suggested activity scheduling. Tr. 449.

On March 27, 2006, Dr. Fernandes submitted a letter regarding his treatment of Pettit in which he wrote: "[S]he carries a diagnosis of Bipolar Disorder, with active symptoms since 1986, consisting of episodes of mania characterized by excessive cheerfulness, pressured speech and making big plans, as well as episodes of depression. . . .  Her symptoms have rendered her unable to function normally, as in achieving gainful employment. . . . "  Tr. 722.  He ends his letter by stating that Pettit "is expected to continue to be unable to work as a result of her bipolar disorder."  *Id.*

The record also contains medical records from Bellevue Family Practice from October 27, 2000, through December 17, 2004.  Tr. 359-415.  Those records generally comport with records from the VA, with reports of back pain and numbness (Tr. 368, 388, 394, 395), notes regarding bipolar diagnosis and medications (Tr. 363, 388), and reports of anxiety and daily panic attacks (Tr. 362, 392).

8

Evidence in the record shows that consulting psychologist Rebecca K. Brayman, Ph.D., performed a psychiatric review of Pettit at the request of the Social Security Administration on November 21, 2000.  Tr. 170-186.  In a summary of that report, Dr. Brayman writes:  "The claimant takes care of her preschool child, household, and is taking four college classes per term to become a dietician.  The claimant receives 'A's' in her college classes.  The claimant has mild problems in social functioning in that she won't answer the ringing telephone."  Tr. 186.  Brayman also assessed Pettit on April 23, 2002.  Tr. 236-256.  On January 25, 2005, Dr. Brayman affirmed as true the results of a psychiatric review done on October 18, 2004, by another examiner whose name is illegible in the record.  Tr. 421-435.  In all three reports, the consulting psychologists opine that Pettit has impairments, but that none of those meet the Listings for those impairments.  Tr. 170-186, 236-256, 421-435.

The Social Security Administration also contracted with Drs. Glen D. Knosp, J.A. Reed, and Donald Larson to assess Pettit's RFC regarding her back impairment.  Tr. 187-194, 257-285, 343-357.  All three doctors opined that Pettit retained sufficient RFC to perform work subject to some limitations.  *Id.*

Pettit's hearing testimony generally coincides with her treating physicians' opinions but goes into much more detail regarding specific injuries to her back (Tr. 749-750) and physical limitations (Tr. 741-743), and depressive, manic, and anxiety episodes, their causes and their results (Tr. 744-750).  Specifically, Pettit testified that her back condition causes her to have her husband do any kind of lifting for her and that he must sometimes assist her in getting dressed.  Tr. 742-743.  She also testified that her husband has had to

9

miss "a lot" of work to stay home and help her when she is having a bad day dealing with both her back and bipolar symptoms.  Tr. 743-744.

Pettit described three particular manic episodes.  Tr. 749-750, 760-761.  She testified that in the first episode she suddenly decided she needed to remove bushes and plants from her backyard and worked for eight hours tearing out as many plants and bushes as possible.  Tr. 749.  Pettit further testified about the episode which caused her to be hospitalized in July of 2004.  Tr. 749-750.  In that episode, she woke up one morning with the racing thought that she needed to reupholster all her furniture, even though she did not know how to do so.  *Id*.  She bought all the supplies and proceeded to work for two days without sleep to complete the reupholstering.  *Id*.  The third episode involved her son.  Tr. 760-761. In that episode, she thought she must drive herself and her sleeping son to Tennessee from her home in Bellevue, Nebraska.  *Id*.  Packing only snacks for her son and a basket of photos, she began driving.  *Id*.  When she arrived in St. Louis, her son woke up and demanded to go home.  *Id*.  Pettit then called a friend, who persuaded her to return and remained on the phone with her for four or five hours while she drove home.  *Id*.

Pettit also testified regarding her structured environment.  Tr. 755-757, 759-760, 761-765.  She, her husband and son moved next door to her in-laws so that they could help her take care of her and her son while her husband was working.  Tr. 761.  She described an incident when she held an internship with a master chef.  Tr. 764-765.  The internship was near the end of her schooling and was supposed to last four weeks.  *Id*.  She became so agitated during the internship that she told her advisor that she could not finish it.  *Id*.  Pettit stated that because of her special needs, her advisor allowed her to drop the internship and write a paper in order to finish the class and graduate.  *Id*.

Pettit's husband, Mark Pettit, also testified at the hearing.  Tr. 766-769.  He testified that his work records revealed he had missed 29 full and 24 partial days to assist Pettit and their son in 2003, and that in 2004, he took off 38 full and 19 partial days to do the same. *Id*.  He stated that after 2004, his father was able to take on this caretaker role, and his absences have been far less frequent.  *Id*.  Mark Pettit testified that his father comes over in the mornings and gets Pettit's son ready for school and also cares for the son after school when Mark Pettit is unable to do so.  *Id*.  Mark Pettit's testimony also confirms Pettit's testimony regarding the episode in which she removed much of the plant life in their backyard.  *Id*.

As part of her treatment at the VA, Pettit participated in art therapy.  Tr. 449, 744-746.  In coordination with that program, she attended Metropolitan Community College for the sculpting/ceramics class.  Tr. 744-746. Pettit testified that she had been taking the class as art therapy for a "couple years" as of her hearing date.  Tr. 745.  She related that she was not taking it for a grade, that she does the work at home, and that she has someone take her completed projects to her teacher for her, which the teacher allows because the teacher is aware of her "special needs."  Tr. 745-746.

## STANDARD OF REVIEW

When reviewing the decision not to award disability benefits, the district court does not act as a fact-finder or substitute its judgment for the judgment of the ALJ or the Commissioner.  *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995).  *See also Wiese v. Astrue*, 552 F.3d 728, 730 (8th Cir. 2009) (stating that the district court could come to a different conclusion is not sufficient basis for reversal).  Rather, the district court will affirm the Commissioner's decision to deny benefits if it is supported by substantial evidence in

the record as a whole. *Bowman v. Barnhart*, 310 F.3d 1080, 1083 (8th Cir. 2002), quoting *Cox v. Apfel*, 160 F.3d 1203, 1206 (8th Cir. 1998). Under this standard, substantial evidence means something "less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).

In determining whether the evidence in the record as a whole is substantial, the district court must consider "evidence that detracts from the Commissioner's decision as well as evidence that supports it." *Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001). If the district court finds that the record contains substantial evidence supporting the Commissioner's decision, the court may not reverse the decision because the record also contains substantial evidence that supports a different outcome or because the court would have decided the case differently. *Id.*

## LAW

A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. . . ." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505. The Social Security Administration has promulgated a sequential process to determine whether a claimant qualifies for disability benefits. *See* 20 C.F.R. § 404.1520(a); *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). The Commissioner determines: "(1) whether the claimant is engaged in any substantial gainful activity; (2) whether the claimant has severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1; (4) whether the claimant can return to her past relevant work;

12

and (5) whether the claimant can adjust to other work in the national economy." *Tilley v. Astrue*, 580 F.3d 675, 679 (8th Cir. 2009).

Substantial gainful activity is defined as work that is both substantial and gainful. 20 C.F.R. § 404.1572. Substantial activity is work that involves doing substantial physical or mental activities. 20 C.F.R. § 404.1572(a). Gainful activity is work for which a person is paid or receives a profit. 20 C.F.R. § 404.1572(b). In addition to involving substantial mental or physical activities for pay, substantial gainful activity is only considered a successful work attempt if it lasts for six months or longer without a claimant's impairment forcing an end to the work or a fall below the "substantial" or "gainful" standards. 20 C.F.R. § 404.1574(c)(1)-(2).

A disability determination by the Veteran's Administration ("VA") is not binding on the ALJ's decision; however, it is "entitled to some weight and must be considered in the ALJ's decision." *Hamel v. Astrue*, 620 F.Supp.2d 1002, 1025 (D.Neb. 2009), quoting *Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998). If the ALJ rejects the finding of the VA, "reasons should be given to enable a reasoned review by the courts." *Morrison v. Apfel*, 146 F.3d at 628. The ALJ errors when a disability determination by the VA is not given explicit attention. *Id*.

Error exists when an ALJ fails to consider or discuss a treating physician's opinion that a claimant is disabled when the record contains no contradictory medical opinion. *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001). "[A] treating physician's opinion regarding an applicant's impairment will be granted 'controlling weight,' provided the opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record.'" *Prosch*

*v. Apfel*, 201 F.3d 1010, 1012-1013 (8th Cir. 2000), quoting 20 C.F.R. § 404.1527(d)(2). The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions. *Hogan v. Apfel*, 239 F.3d at 961. A complaint's subjective complaints must also be given controlling weight, unless contrary to evidence on the record. "An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole." *Jackson v. Apfel*, 162 F.3d 533, 538 (8th Cir. 1998), quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997). In contrast, "[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998); *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000) (holding that is was improper for an ALJ to rely on the opinions of reviewing physicians alone.).

The Listings specify the criteria for each impairment that is considered presumptively disabling. 20 C.F.R. Pt. 404, Subpt. P App. 1. The Listings for mental impairments generally consist of a set of medical findings that medically substantiate the mental disorder ("Paragraph A criteria"), a set of impairment-related limitations that show effects of the impairment on functions deemed essential to work ("Paragraph B criteria"), and certain functional limitations ("Paragraph C criteria"). 20 C.F.R. Pt. 404, Subpt. P, App. 1 §§ 12.00(A); see generally *Pratt v. Sullivan*, 956 F.2d 830, 834 & nn. 7 & 9 (8th Cir. 1992). With respect to mental impairments, a certain review technique must be conducted and documented at each level of the review process, including the ALJ level. 20 C.F.R. § 416.920a(a)-(e); *Nicola v. Astrue*, 480 F. 3d 885, 887 (8th Cir. 2007) (noting that documentation is generally provided in a standard form.)

14

To be presumptively disabled by reason of bipolar disorder, a claimant must satisfy criteria set forth in the Listing for affective disorders in 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04. A claimant who meets the clinical findings criteria[2] and exhibits two of the four functional restriction criteria[3] is presumed to be disabled by bipolar syndrome. *Id.* A claimant may be presumptively disabled by reason of an anxiety-related disorder if she presents medically documented findings of generalized persistent anxiety accompanied by at least three of the four listed signs or symptoms[4] or recurrent obsessions or compulsions which are a source of marked distress along with at least two of the four functional restriction criteria.[5]

The Listings for disorders of the musculoskeletal system, including disorders of the spine, generally consist of a set of medical findings that medically substantiate the disorder. An impairment meets the listing for musculoskeletal disorder if it causes loss of function, which is shown by inability to ambulate effectively, inability to perform fine or gross motor movements effectively, and/or is accompanied by pain. 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.00. A claimant is presumptively disabled by reason of disorders of

---

[2]Under the Social Security regulations, the clinical findings criteria are: "Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(3).

[3] Those four criteria are: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04 (functional restriction criteria for bipolar disorder).

[4]Those four signs or symptoms are: (1) motor tension; (2) autonomic hyperactivity; (3) apprehensive expectation; and (4) vigilance and scanning. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06(A)(1)(a)-(d).

[5]Those four criteria are: (1) marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; and (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1206(B)(1)-(4) (functional restriction criteria for anxiety-related disorder).

the spine if she shows "evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test."  20 C.F.R. Pt 404, Subpt. P, App. 1, § 1.04(A).

If a claimant has a severe mental or physical impairment that does not meet the Listings, the Commissioner will then assess RFC.  20 C.F.R. § 404.1520a(d)(3).  Although RFC is a medical question, _Nevland v. Apfel_, 204 F.3d 853, 858 (8th Cir. 2000), RFC is not based solely on "medical" evidence.  _See McKinney v. Apfel_, 228 F.3d 860, 863 (8th Cir. 2000) (holding that the Commissioner must determine a claimant's RFC based on all of the relevant evidence, including medical records, observations of treating physicians and others, and an individual's own description of their limitations); _see also_ 20 C.F.R. §§ 404.1545, 404.1546.

A claimant may have symptom-free intervals and still be considered disabled.  _Andler v. Chater_, 100 F.3d 1389, 1393 (8th Cir. 1996).  "We are mindful that '[i]t is inherent in psychotic illnesses that periods of remission will occur,' and that such remission does not mean that the disability has ceased."  _Id_., quoting _Miller v. Heckler_, 756 F.2d 679, 681 n.2 (8th Cir. 1985).  "Symptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse.  _Andler v. Chater_, 100 F.3d at 1393.  A claimant may experience a lessening or remission of signs and symptoms of mental illness due to creation of a structured environment.  20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00(E).

It is the ALJ's duty to investigate the facts and develop arguments both for and against granting benefits.  _Sims v. Apfel_, 530 U.S. 103, 111 (2003) (noting that "social

security proceedings are inquisitorial rather than adversarial").  It is well-settled that the ALJ's duty to fully and fairly develop the record includes the responsibility of ensuring that the record includes evidence addressing the alleged impairments at issue from either a treating or examining physician.  *Snead v. Barnhardt*, 360 F.3d 834, 838 (8th Cir. 2004) ("The ALJ possesses no interest in denying benefits and must act neutrally in developing the record").

## DISCUSSION

In the instant case, the ALJ determined that Pettit's impairments did not meet or equal the Listings.  Tr. 17.  This determination was based on the ALJ's reading of Pettit's treating physicians' opinions, Social Security Administration-chosen consulting physicians' opinions, and hearing testimony of Pettit and her husband.  Tr. 17-27.  Pettit appeals this decision based on ALJ error in that the ALJ did not base her decision upon substantial evidence and that the decision she reached was contrary to law and the facts presented in this case.  Filing No. 1.

The ALJ was correct in determining that Pettit's back impairments did not render her disabled according to Social Security Administration guidelines.  Pettit does have medically-diagnosed degenerative disk disease and meets the first requirement of the Listing for that impairment in 20 C.F.R. Part 404, Subpt. P, App. 1, § 1.04.  That disease frequently causes Pettit a great deal of pain and has even resulted hospitalization. However, the medical record does not support the meeting of § 1.04(A) of the Listing.  The requirements of that section are conjunctive.  A claimant must experience limited range of motion, motor loss, accompanied by sensory or reflex loss, and positive straight-leg raising test when the lower back is involved.  While VA and Nebraska Spine Center medical

17

records do show limitations in Pettit's range of motion, Tr. 327, 495, 516, they are also consistent in showing no motor, sensory or reflex losses and negative straight-leg raising test results. On February 14, 2002, John W. Sype and Dr. Nicoline W. Lee from the VA noted negative straight-leg lifts. Dr. Eric Phillips from the Nebraska Spine Center noted the same on August 9, 2004. Although Pettit has been diagnosed with degenerative disk disease that causes pain and some limited range of motion, Pettit's back impairment does not fully meet the Listing for disorders of the spine. She, therefore, is not disabled by reason of her degenerative disk disease.

The inquiry into Pettit's disability determination does not end with her back impairments. Her mental impairments must also be considered. The ALJ did consider Pettit's mental impairments but erred in her decision. Pettit's mental impairments are disabling, and the record supports that determination.

In determining that Pettit was not disabled by mental impairments, the ALJ failed to give Pettit's treating physicians' opinions controlling weight in her decision. Dr. Mead treated Pettit for almost two years, and Dr. Fernandes treated her for just over three years. Drs. Mead and Fernandes and their predecessors at the VA determined that Pettit was disabled. The ALJ is not held to a disability determination by the VA, but she must give it consideration and if she rejects it, must give reasons that enable a reasonable review. The ALJ's decision shows that she did consider the VA determination but dismissed it rather summarily by noting that the Social Security Administration and its Commissioner use different standards for determining disability. To support her opinion the ALJ analyzes the Axis V diagnosis GAF scores V periodically ascribed by Petit's treating psychiatrists. The scores range from GAF 40 to 75 (which range not unexpectedly is consistent with a Axis

I diagnosis of bipolar disorder).  Based on this analysis and the findings of the consulting psychiatrist, the ALF concludes that Dr. Fernandes's determination of disability and inability to work are "widely inconsistent with and unsupported by" the assessments and medical reports in the record. The ALJ also notes that the fact that Pettit was able to successfully complete an Associate's of Arts degree with high marks during her insured status negates a finding of disability. This court disagrees.  The VA doctors' opinions are supported by the record as a whole.

The record shows Dr. Mead as Pettit's first long-term treating mental health physician.  Although Dr. Mead's notes frequently show Pettit as "pleasant" and "doing well," a closer look at the notes reveals that Pettit's impairments drastically affected her life.  Dr. Mead notes that Pettit's obssessive-compulsive personality causes her so much concern in her college courses that she is unable to sleep the night before an exam and that if Pettit fears she will not earn an "A" in her class, she must drop that class.  Dr. Mead also noted that Pettit was "not happy at all" and was in "obvious distress" due to her bipolar disorder, even when receiving the great news that her article would be published.  Pettit's life was also affected by her generalized anxiety disorder, as shown in Dr. Mead's treatment notes.  Dr. Mead's diagnosis of anxiety disorder came after a visit in which Pettit described her difficulties in her encounters with co-workers, which eventually led Pettit to the decision not to return to work.   Dr. Mead's diagnoses and opinions are supported by Pettit's VA Compensation and Pension Examination performed by Dr. E. Haffke during this time.  Dr. Haffke's notes agree with Dr. Mead's; Pettit is miserable, sad, and her depressive symptoms persist.

When Dr. Mead left the VA, Dr. Fernandes continued Pettit's treatment for another three years.  In those three years, Dr. Fernandes also found Pettit to be depressed and experiencing feelings of hopelessness.  In May of 2002, Dr. Fernandes reported that Pettit was sleeping up to twenty hours a day.  Throughout Dr. Fernandes's treatment of Pettit, he notes at different times that her bipolar disorder appears to be in remission, but this does not negate a finding of disability.  A determination of disability, even when there are periods of remission, is fully consistent with case law and Social Security regulations.

Drs. Mead and Fernandes are treating physicians who saw Pettit as a patient at the VA.  Dr. Mead opined that Pettit's mental impairments significantly affected her work adjustment; Dr. Fernandes opined that Pettit would be unable to maintain employment. These opinions of disability are from the VA, so they are not binding upon the ALJ; however, these were Pettit's treating physicians, and their opinions must be given controlling weight, unless there is substantial contrary evidence or those opinions are inconsistent.

The ALJ points to the evaluations of Dr. Rebecca Brayman to show substantial contrary evidence.  The record shows that Dr. Brayman examined Pettit twice over a period of two years and merely acknowledged as true the examination of another consulting psychologist at a later date.  Dr. Brayman stated that because Pettit was able to care for her child and complete college classes, she was not suffering from a disabling mental condition.  What Dr. Brayman failed to mention was that, as VA records indicate, Pettit was only able to cope independently with help from her husband, in-laws, and VA treatment. Pettit was raising her child only with significant help from her husband and in-laws, and she was able successfully complete college classes only by making special accommodations

with her teachers, such as taking tests and completing labs in solitary areas and substituting a paper for completion of an internship when the stress of an internship caused Pettit to quit the internship.

The ALJ points to "inconsistent" opinions of Drs. Mead and Fernandes in discrediting their disability determinations. As noted above, it is true that the record does contain notes stating the Pettit is "doing well" or is in remission, but read as a whole, those notes are not inconsistent with a determination of disability. It is possible to appear well and experience periods of remission while still suffering the effects of obsessive-compulsive personality, bipolar disorder, and generalized anxiety. Both doctors' notes and opinions reflect that reality. Since Pettit's treating physicians' opinions are supported by the record as whole and are consistent, they must be given controlling weight.

In addition to the opinions of Pettit's treating physicians, Pettit's own subjective complaints must be given controlling weight because they are also consistent with the record as a whole. She testified that her manic episodes caused her to tear out most of the landscaping in her yard, stay up for two days in order to reupholster furniture, and embark on a suddenly-urgent trip to Tennessee with her son without packing. She needed a friend to remain with her on the phone for four or five hours in order to return home. Pettit also testified that her husband does most of the household chores for her and that he and his father must assist her in taking care of herself and their son. She also testified that she was able to complete her Associate's degree, but only with special accommodations. These statements are not inconsistent with the record. The manic episodes she described are fully consistent with effects of bipolar disorder and her physicians' notes. While neither Dr. Mead nor Dr. Fernandes specifically notes those

21

incidents, they do note periods of extreme high energy followed by depressive periods, which support Pettit's recollection of those incidents.  Pettit's accounts of the necessity of a structured environment is specifically reflected in Dr. Fernandes's notes.  In a period during which Pettit was experiencing marked distress, Dr. Fernandes recommended returning to activity scheduling, and approved of her return to ceramics class for part of her therapy.

The record lacks substantial evidence to support a finding that Pettit is disabled by reason of her anxiety-related disorder; however, when Pettit's treating physicians' opinions and her own subjective complaints are given controlling weight, Pettit's impairments do meet the Listings for bipolar disorder.  The record is replete with evidence showing a history of "episodic periods" of both manic and depressive syndromes.  Physicians' notes and Pettit's testimony show how those episodic periods caused at least two of the four listed functional restrictions.  Pettit's impairments caused marked restriction of activities of daily living.  That restriction is shown in her decision not to have more children, her inability to take care of herself and son, periods in which she would sleep twenty hours a day, and the inability to perform basic household tasks.  Pettit also has marked difficulties in maintaining social functioning.  The record reflects that Pettit was unable to complete her course labs and examinations without the special accommodation of solitary areas.  She was also not able to participate in therapeutic pottery class in a traditional manner.  Her husband or friend had to transfer her work back and forth from her teacher in order that Pettit would not have to endure the overwhelming stress of that social encounter.

The record shows Pettit's medically-documented bipolar disorder and its effects meet two of the four functional restriction criteria.  Therefore, Pettit is disabled by reason

22

of bipolar disorder.  The ALJ erroneously discredited the opinions of Pettit's treating physicians and Pettit's own subjective complaints and instead relied upon the opinions of a consulting physician who only examined Pettit two times.  If the ALJ would have correctly relied upon the opinions of Drs. Mead and Fernandes and Pettit's subjective complaints, she would have found Pettit disabled by reason of bipolar disorder at the third step of the five-step process and need not have considered her RFC.  20 C.F.R. § 404.1520(a).  If the claimant meets the criteria of steps 1, 2, or 3, no further analysis is necessary; the claimant is considered disabled and is granted benefits.

The court finds that the analysis of Pettit's case should end at step three with a finding that substantial medical and subjective evidence in the record shows her mental impairment meets or equals the Listing for bipolar disorder.  Because she is determined disabled at that step, it is not necessary to analyze whether she has the requisite RFC to be able to perform some previous or other work activity.


**CONCLUSION**

The court concludes that the clear weight of the evidence leads to a determination that Pettit was disabled within the meaning of 20 C.F.R. Pt 404, Subpt. P, App. 1, § 1204(A)(3), from February 5, 2001, through March 31, 2005.  Where further hearings would merely delay receipt of benefits, an order granting benefits is appropriate.  *See* *Hutsell v. Massanari*, 259 F.3d 707, 714 (8th Cir. 2001), quoting *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir. 1984).  Accordingly,

23

IT IS ORDERED that the decision of the Commissioner is reversed and this action is remanded for an award of benefits.  A separate judgment is filed in connection with this Memorandum and Order.

DATED this 26th of July, 2010.

BY THE COURT

s/ Joseph F. Bataillon
Chief United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.